IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

SCOTT MICHAEL; and ROOSTER'S                                          PLAINTIFF
BLUES HOUSE, LLC

V.                                                        NO. 3:14-CV-00116-DMB-SAA

CLINTON L. BOUTWELL; and THE
CHAR GRILLE SEAFOOD & STEAKS
LLC d/b/a OXFORD GRILLEHOUSE                                         DEFENDANTS

**ORDER DENYING MOTIONS TO DISMISS**

This contract dispute is before the Court on: (1) the Rule 12(b)(6) motions to dismiss of Defendants Clinton L. Boutwell and the Char Grille Seafood & Steaks LLC d/b/a Oxford Grillehouse, Doc. #3; Doc. #14; and (2) Defendants' motion for sanctions, Doc. #3. Defendants seek dismissal of the complaint and amended complaint filed by Plaintiffs Scott Michael and Rooster's Blues House, LLC.

**I
12(b)(6) Standard**

As a general matter, "[a] pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a complaint falls short of this directive, a defendant may move to dismiss the claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering the interplay between Rule 8 and Rule 12, the United States Supreme Court has explained that:

> To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and punctuation omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–58 (2007)). Under this standard, a "court must accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n.44 (5th Cir. 2011) (internal quotation marks and punctuation omitted).

In addition to the standard articulated by *Iqbal* and *Twombly*, Rule 9(b) of the Federal Rules of Civil Procedure requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This heightened pleading standard is "supplemental to the Supreme Court's recent interpretation of Rule 8(a) …." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). As a supplement, Rule 9 requires "simple, concise, and direct allegations of the circumstances constituting fraud, which … must make relief plausible, not merely conceivable, when taken as true." *Id.* at 185–86 (internal quotation marks omitted).

## II
## Factual Allegations and Procedural History

**A. The Parties and Relevant Property**

Plaintiff Scott Michael owns and operates Plaintiff Rooster's Blues House, LLC ("Rooster's"). Doc. #12 at ¶ 6. Together, Plaintiffs lease a three-story building located at 114 Courthouse Square, Oxford, Mississippi ("Building"). *Id.* The Building has an upstairs (second floor), a downstairs (first floor), and a basement, with a fully equipped commercial kitchen on the first floor. *Id.* at ¶¶ 6, 9.

Prior to May 2013, Plaintiffs operated Rooster's Blues House, a restaurant and bar in the Building. Doc. #12 at ¶ 6. The business primarily served food on the first floor and alcohol on the second floor. *Id*. Plaintiffs used the basement for storage of equipment. *Id*. Pursuant to the terms of Rooster's restaurant license, the premises was required to derive at least 25% of its revenue "from the preparation, cooking and serving of meals …." Miss. Code Ann. § 67-1-5(m)(i); *see also* Doc. #12 at ¶ 7.

Defendant Clint Boutwell operates Defendant The Char Grille Seafood & Steaks LLC d/b/a Oxford Grillehouse ("Grillehouse"). Doc. #27-1.

**B. The Sublease**

In December 2012, Michael and Boutwell entered into negotiations regarding a potential sublease of the first floor of the Building, including use of the commercial kitchen. Doc. #12 at ¶¶ 9, 12. During the course of the negotiations, Boutwell promised Michael that "he would cook and provide food from a simpler menu to Rooster's patrons upstairs." *Id* at ¶ 12. Following Boutwell's promise, the parties agreed that they needed to check with the Mississippi Alcohol Beverage Control Commission ("ABC") regarding the proposed arrangement. *Id*.

Shortly after the decision to contact the ABC, Boutwell informed Michael that "he had discussed [the] arrangement with the ABC and that they had approved it." Doc. #12 at ¶ 12. Boutwell made this statement "on the phone … and throughout a number of face-to-face meetings held in the [B]uilding from before Christmas of December 201[2], up until about a week before the lease was actually signed [on May 12, 2013]." *Id*.

"About a week before" May 12, 2013, the ABC informed the parties that the Grillehouse would not be permitted to provide food to Rooster's. Doc. #12 at ¶ 13. In response to the ABC's decision, Boutwell told Michael that "that he would install a small kitchen upstairs in

3

Rooster's and would provide someone to run it, and that Michael would pay him for this service." *Id.* at ¶ 14. Boutwell made these statements to Michael over the telephone and in Michael's office between the day ABC provided notice to the parties that the Grillehouse could not provide food to Rooster's and the day the lease was signed. *Id.* Boutwell allegedly made these statements without "any intention of providing food to Rooster's [and to put himself] in the position of taking over the Plaintiffs' business." Doc. #12 at ¶ 16.

On May 12, 2013, the parties executed a sublease for part of the Building. Doc. #27-1.[1] Under the terms of the sublease, Plaintiffs leased to the Grillehouse "Suite A," described as "the first floor, kitchen and basement" of the Building. *Id.* at ¶ 1. Plaintiffs retained control of the second floor, identified as "Suite B."

Of relevance here, the sublease further provided:

> [Rooster's] gives [Grillehouse] the option to serve its menu to customers … on the second floor and/or balcony. Should [Grillehouse] decide to serve food, it shall obtain permission from [Rooster's] owner, Scott Michael, before proceeding to serve in such a fashion. If [Grillehouse] is allowed to serve food in Suite B, it shall be without any contingency or fee due to [Rooster's]. [Grillehouse] shall not serve alcohol of any type in Suite B and [Rooster's] shall not serve alcohol in Suite A. [Rooster's] will always maintain alcohol sales in Suite B.

Doc. #27-1 at ¶ 25.

The sublease also contained a merger clause, providing:

> *Entire Agreement:* This agreement constitutes the essential terms of the Agreement between the parties for the purposes stated herein and no other offers, agreements, understandings, warranties or representations exist between the parties. Any additional terms of the Agreement shall be in writing, signed by each owner, and made a part of this Sub-Lease as an addendum thereto.

*Id.* at ¶ 34.

---

[1] Documents "attache[d] to a motion to dismiss are considered to be part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (internal quotation marks omitted). The sublease is attached to Defendants' motion to dismiss, is referenced in the amended complaint, and is clearly central to Plaintiffs' claims.

### C. Subsequent Promises and ABC Inspections

Despite numerous post-execution promises to comply with his promise to install a kitchen, Boutwell repeatedly postponed the installation. Doc. #12 at ¶ 17. Plaintiff alleges that he "rel[ied] upon Boutwell's intentionally false statements and efforts to lull him to sleep on the issue." *Id.* at ¶ 18. As a result of this reliance, Rooster's lost "a great deal of business [and fell] far behind in establishing [the] necessary food sales for the months and for the year." Doc. #12 at ¶ 19.

Additionally, in the months following the execution of the sublease, Boutwell would "come upstairs to have drinks and visit with Michael and others." Doc. #12 at ¶ 21. Boutwell used these visits "to scout out anything he could think of that he could report to [the ABC] whether it was accurate or not, to try and get the Plaintiffs in trouble." *Id.*

Sometime between May and July of 2013, Boutwell called an ABC agent and reported that Rooster's was not serving food. Doc. #12 at ¶ 22. Later, the agent came into Rooster's and stated that he had heard Rooster's "didn't even have a loaf of bread behind the counter." *Id.*

Approximately two months after the execution of the sublease, Rooster's began construction of a small upstairs kitchen. Doc. #12 at ¶¶ 18, 24. After a few weeks of operation, the fryer in the small kitchen malfunctioned and Rooster's sent it off for a five or six day repair. *Id.* at ¶ 24.

When the fryer was sent for repair, Boutwell informed the ABC of the problem. Doc. #12 at ¶ 25. While the fryer was still out for repair, ABC agents conducted an inspection of Rooster's kitchen and an audit of Rooster's food sales. *Id.* During the inspection, an ABC agent informed Michael that the ABC "acted on reports of problems." *Id.* at ¶ 26.

After the second ABC inspection, Rooster's contracted with a restaurant across the street to cook food in the upstairs kitchen. Doc. #12 at ¶ 28. Although this arrangement worked "for a short period," the kitchen soon experienced another equipment problem. *Id*. While dealing with this new problem, the restaurant then responsible for food preparation began bringing food from its premises to Rooster's. *Id*. At the time, Boutwell informed "a number of people that he knew it was going to happen, and that he was going to make a video of it happening." *Id*. at ¶ 29. The food transportation continued until an ABC agent came to Rooster's and informed Rooster's employees that a video had surfaced of the restaurant carrying food across the street and that "it was likely that Rooster's ABC license would not be renewed." *Id*. at ¶ 30.

Sometime later, the ABC conducted a second audit of Rooster's business. Doc. #12 at ¶ 34. The audits required Rooster's "to spend a great deal of money to prepare for [them]." *Id*.

### D. Boutwell's Public Statements

In the past, Boutwell told "a number of people words to the effect that he owned … the ABC and that they would do whatever he wanted." Doc. #12 at ¶ 23. Boutwell also told people, including Michael, that he "wanted to get Rooster's shut down so that he could own the bar." *Id*. at ¶ 32. To this end, Boutwell told ABC agents and others "that Rooster's intentionally serves minors, that Rooster's serves liquor after hours, that its managers get drunk at work, that Michael himself is a drunk, and that Plaintiffs intentionally violate the law in other ways." *Id*. at ¶ 31. Plaintiffs allege that Boutwell made the statements regarding Rooster's compliance with the law "know[ing] the falsity of these statements or [without] concern[] whether they are true or not …." *Id*.

Similarly, acting with the intent to take over the Building lease, Boutwell made numerous statements to Plaintiffs' landlord designed to "poison the relationship" and suggest that Plaintiffs

6

would be unable to pay their bills. Doc. #12 at ¶ 37. Finally, Boutwell made statements "to business owners in the community, to the ABC and its agents, and to various others about the Plaintiffs' allegedly criminal activities … inability to pay bills and other problems …." *Id*. at ¶ 38. As a result of these statements, Plaintiffs suffered injury. *Id*.

### E. Procedural History

On May 30, 2014, Plaintiffs filed this action. Doc. #1. On July 16, 2014, Defendants filed a motion to dismiss and for sanctions. Doc. #3. On August 5, 2014, Plaintiffs filed a multi-count amended complaint.[2] Doc. #12. On August 22, 2014, Defendants filed a second motion to dismiss. Doc. #14.

## III
## Motion to Dismiss Original Complaint and for Sanctions

"[A]n amended complaint supersedes [an] original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading …." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994). When a motion to dismiss has been filed against a superseded complaint, the proper course is to deny the motion to dismiss as moot. *See, e.g., Sartori v. Bonded Collect Servs.*, 2:11-cv-030, 2011 WL 3293408, at *1 (N.D. Miss. Aug. 1, 2011) ("The defendant's March 26, 2011 motion to dismiss for lack of personal jurisdiction should be denied as moot since the plaintiff filed an Amended Complaint subsequent to the filing of the first motion to dismiss."); *Fit Exp., Inc. v. Circuit-Total Fitness*, No. 1:07-cv-62, 2008 WL 4450290, at *1 (N.D. Miss. Sep. 29, 2008) ("Because Plaintiff's Counterclaims were amended, Defendants' previously filed Motion to Dismiss … is denied as moot").

---

[2] Rule 15(a) of the Federal Rules of Civil Procedure authorizes a party to amend its pleading once as a matter of course within 21 days after service of a motion under Rule 12(b).

7

Here, insofar as the amended complaint does not reference or incorporate the original complaint, the latter has been superseded by the former. Accordingly, the motion to dismiss the original complaint, Doc. #3, must be denied as moot. For the same reason, insofar as the motion for sanctions relates to a superseded complaint, such motion will be denied as moot.[3]

## IV
## Motion to Dismiss Amended Complaint

The amended complaint does not separate its claims into separate counts. However, based on the language of the complaint and subsequent filings, it appears Plaintiffs assert the following claims: (1) fraud; (2) fraud in the inducement; (3) breach of contract; (4) "intentional interference with contracts and prospective contracts;" (5) defamation; (6) defamation per se; and (7) violation of due process. Defendant seeks dismissal of all of Plaintiffs' claims on the grounds that: (1) the allegations of fraud are not pled with particularity; (2) the amended complaint does not allege facts to support liability under any of Plaintiffs' claims. Doc. #15.

As explained above, Rule 9(b) of the Federal Rules of Civil Procedure requires that allegations of fraud be pled with particularity. "Rule 9(b) serves three purposes: first, the Rule ensures that defendants receive fair notice of the plaintiffs' claims; second, it protects the defendants' reputations from unfounded allegations of improper conduct, and third, the Rule helps prevent the institution of strike suits." *Cypress/Spanish Ft. I, L.P. v. Prof. Serv. Indus., Inc.*, 814 F. Supp. 2d 698, 712 (N.D. Tex. 2011) (internal punctuation and quotation marks omitted omitted).

"[I]t is allegations of fraud, not claims of fraud, to which Rule 9(b) applies." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011). Accordingly, "whether the rule applies will depend on the plaintiffs' factual allegations."

---

[3] Defendants concede that the motion for sanctions and motion to dismiss the original complaint were mooted by the filing of the amended complaint. *See* Doc. #27 at 13.

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027–28 (9th Cir. 2005)); *see also Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003) (applying Rule 9(b) to "negligent misrepresentation claims … based on the same set of alleged facts [as fraud claim]").

Here, the amended complaint contains 32 separate factual allegations covering the array of conduct described above. Following these factual allegations, the amended complaint includes twelve "legal allegations," which plead various causes of action. Rather than linking causes of action to particular factual allegations, Plaintiffs simply allege in conclusory fashion that, in each instance, Defendants "conduct constitutes" a particular tort or contract claim. *See, e.g.,* Doc. #12 at ¶ 39 ("The Defendants' conduct constitutes fraud in the inducement of the sublease contract."); ¶ 41 ("The Defendants conduct in harming the Plaintiffs' sales constitutes intentional interference with contracts and prospective contracts."); ¶ 42 ("The Defendants' conduct constitutes defamation."); ¶ 43 ("The Defendants' conduct constitutes defamation *per se*."); ¶ 44 ("The Defendants' conduct constitutes fraud."); ¶ 47 ("The Defendants actions constitute a taking in violation of the Plaintiffs' procedural due process rights under the 14th amendment to the United States Constitution"). Put differently, the amended complaint wholly fails to plead which alleged facts support which causes of action.

District courts have a "supervisory obligation to sua sponte order repleading pursuant to Federal Rule of Civil Procedure 12(e) when a shotgun complaint fails to link adequately a cause of action to its factual predicates." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1275 (11th Cir. 2006). As this Court has previously explained:

> Shotgun pleadings, which are prohibited by the Federal Rules, are characterized as complaints containing several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions.

*Sahlein v. Red Oak Capital, Inc.*, No. 3:13-cv-67, 2014 WL 3046477, at *3 (N.D. Miss. July 3, 2014) (internal quotation marks and citations omitted). Shotgun complaints are problematic because they force a "trial court to sift out the irrelevancies, a task that can be quite onerous." *Id*. (internal punctuation omitted)

Beyond forcing the Court to sift through irrelevant factual pleadings for each cause of action, Plaintiff's failure to link his claims to his factual allegations creates a more fundamental problem. Without sufficient factual allegations for each claim, the Court cannot determine which claims sound in fraud. Without the ability to determine which claims sound in fraud, the Court cannot ascertain which claims require application of 9(b)'s heightened pleading standard.

Under these circumstances the Court, pursuant to Rule 12(e), will sua sponte order Plaintiffs to re-plead their complaint. Thus, Defendants' motion to dismiss the amended complaint will be denied as moot. Plaintiffs will be allowed fourteen days from the entry of this order to file a second amended complaint.[4]

## V
## Conclusion

For the reasons above, Plaintiffs are **DIRECTED** to file a second amended complaint within fourteen days from the entry of this order. Furthermore: (1) Defendants' motion to dismiss, Doc. #3, is **DENIED as MOOT**; (2) Defendants' motion for sanctions, Doc. #3, is

---

[4] The Fifth Circuit has recognized that a private party may be liable as a state actor for filing a complaint if the actual state actor who harmed the plaintiff: (1) "acted in accordance with a 'preconceived plan' to take the action "merely because [the action] was designated … by the private party[;]" and (2) the state actor did so "without independent investigation." S*ims v. Jefferson Downs Racing Ass'n, Inc.*, 778 F.2d 1068, 1078–79 (5th Cir. 1985). Plaintiffs are cautioned that a failure to adequately plead sufficient facts to support such alleged state action in this case will likely result in the dismissal of this action for lack of jurisdiction.

**DENIED as MOOT**; and (3) Defendants' motion to dismiss the amended complaint, Doc. #14, is **DENIED as MOOT**.

SO ORDERED, this 19th day of February, 2015.

__/s/ Debra M. Brown__
**UNITED STATES DISTRICT JUDGE**
