**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

SCOTT MICHAEL; and                                                   PLAINTIFFS
ROOSTER'S BLUES HOUSE, LLC

V.                                                        NO. 3:14-CV-00116-DMB-SAA

CLINTON L. BOUTWELL; and
THE CHAR GRILLE SEAFOOD &
STEAKS LLC d/b/a OXFORD
GRILLEHOUSE                                                       DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This contract dispute is before the Court on: (1) Defendants' motion to dismiss for failure to state a claim, or in the alternative, for summary judgment, Doc. #59; (2) Plaintiffs' motion for default judgment, Doc. #65; and (3) Defendants' motion to dismiss for lack of jurisdiction, Doc. #72.

## I
## Factual Background

### A. The Parties and Relevant Property

Plaintiff Scott Michael owns and operates Plaintiff Rooster's Blues House, LLC ("Rooster's"), a restaurant and bar. Doc. #62-2 at 7, 97; Doc. #62-3 at Ex. 3 at 14. Plaintiffs lease a building located at 114 Courthouse Square in Oxford, Mississippi ("Building"), from the Building's owners, Tim Phillips and Andy Phillips. Doc. #62-3 at 49; Doc. #62-2 at 40. The Building has an upstairs (second floor), a downstairs (first floor), and a basement, with a fully equipped commercial kitchen on the first floor. Doc. #62-3 at Ex. 3 at ¶¶ 1, 25.

Prior to May 2013, Plaintiffs operated Rooster's in the Building. Doc. #62-2 at 97. The Building's first floor was then set up "as a great restaurant" and the second floor was set up as "a

nice bar setting." *Id*. While the floors offered different atmospheres, Rooster's provided its full menu on both floors. *Id*. Since July 17, 2008, Rooster's has maintained an Alcoholic Beverage Permit through the Mississippi Department of Revenue. *Id*. at Ex. 4. In order to maintain its permit, Rooster's must derive at least 25% of its revenue from food sales. Doc. #62-2 at Ex. 5; *see also* Miss. Code Ann. §67-1-5(m).

Before May 2013, Defendant Clinton Boutwell owned Defendant The Char Grille Seafood and Steaks, LLC ("Char Grille"), a restaurant then on Jackson Avenue in Oxford. Doc. #62-3 at 64–65.

### B. Rooster's History with the Mississippi Alcohol Bureau Commission

Before the events underlying this action, Rooster's was the subject of at least four administrative actions brought by the Mississippi Alcoholic Beverage Commission ("ABC"). Doc. #62-2 at 53–55. First, on May 26, 2011, Rooster's was either fined or had its license suspended for one week for having an employee intoxicated while on duty.[1] Doc. #60-1 at Ex. 8 at 1. Second, also on May 26, 2011, Rooster's received a letter of reprimand for having an unapproved manager on duty. *Id.* at Ex. 8 at 3. Third, on May 7, 2012, Rooster's license was suspended for one week for serving alcohol to a minor. *Id*. at Ex. 7 at 5. And, on October 1, 2012, Rooster's license was suspended for two weeks for having an unapproved manager on duty and for having a "Permittee Intoxicated or Under the Influence of Alcoholic Beverages." *Id*. at Ex. 13 at 1.

According to Michael, he had "regular friction with the ABC before Mr. Boutwell came." Doc. #62-2 at 115.

---

[1] Michael testified during deposition that the violation resulted in a fine, not a suspension. Doc. #62-2 at 53–55. Documentary evidence shows a suspension. Doc. #60-1 at Ex. 8.

## C. The Sublease

Sometime in 2012, Char Grille outgrew its space on Jackson Avenue and Boutwell began looking for a new location. Doc. #62-3 at 64–65. At some point, Boutwell spoke with Tim Phillips, who informed Boutwell that Michael's lease on the Building was expiring soon. *Id*. at 65. Phillips suggested that Boutwell "partner with Scott." *Id*.

In late January or early February of 2013, Boutwell traveled to Rooster's to discuss a potential sublease with Michael. Doc. #62-2 at 8–9. Shortly after, Boutwell and Michael entered into negotiations for Boutwell to take over the first floor of the Building and for Boutwell to serve food upstairs from his new restaurant, to be renamed the Oxford Grillehouse ("Grillehouse"). *Id*. at 9–10; Doc. #62-4 at 9. At one point during the negotiations, Boutwell represented to Michael that the ABC had approved this arrangement. Doc. #62-2 at 133. However, in late April or early May of 2013, the ABC informed Michael that he would not be allowed to provide food to Rooster's upstairs for Rooster's to serve its customers. *Id.* at 133–34. To address this development, Boutwell told Michael that he would provide food to Rooster's customers until Rooster's established its kitchen. *Id*. The purpose of this arrangement was to allow Rooster's to keep its customer base. *Id*.

On May 12, 2013, the parties executed a sublease for part of the Building. Doc. #62-2 at Ex. 1. Under the sublease's terms, Plaintiffs leased to Grillehouse "Suite A," described as "the first floor, kitchen and basement" of the Building. *Id*. at ¶ 1. Plaintiffs retained control of the second floor, identified as "Suite B."

Of relevance here, the sublease provided:

[Rooster's] gives [Grillehouse] the option to serve its menu to customers … on the second floor and/or balcony. Should [Grillehouse] decide to serve food, it shall obtain permission from [Rooster's] owner, Scott Michael, before proceeding to serve in such a fashion. If [Grillehouse] is allowed to serve food in Suite B, it

shall be without any contingency or fee due to [Rooster's]. [Grillehouse] shall not serve alcohol of any type in Suite B and [Rooster's] shall not serve alcohol in Suite A. [Rooster's] will always maintain alcohol sales in Suite B.

*Id.* at Ex. 1 at ¶ 25. The sublease also contained a merger clause, providing:

*Entire Agreement:* This agreement constitutes the essential terms of the Agreement between the parties for the purposes stated herein and no other offers, agreements, understandings, warranties or representations exist between the parties. Any additional terms of the Agreement shall be in writing, signed by each owner, and made a part of this Sub-Lease as an addendum thereto.

*Id.* at Ex. 1 at ¶ 34. Michael testified during deposition that, notwithstanding the merger clause, the parties omitted an "oral agreement" from the sublease; however, Michael could not recall its substance. *Id*. at 14.

### D. Subsequent Promises and ABC Inspections

Following execution of the sublease, Boutwell made "a number" of promises to Michael regarding operation of the restaurants. Doc. #62-2 at 14. Specifically, Boutwell promised "that he was going to continue to cook upstairs[, that h]e was going to put a kitchen upstairs [and that h]e was going to put kitchen equipment upstairs." *Id*. To this end, Boutwell provided a menu that was approved by the ABC and "briefly" assisted in the application process for establishing Rooster's kitchen. *Id.* at 48.

However, following a visit from the ABC regarding Rooster's kitchen, Michael concluded that Boutwell had no intention of fulfilling his promises regarding food or the kitchen. *Id*. at 44, 68–71, 134. Accordingly, on or before June 17, 2013, Michael acquired a fryer on loan from another company. *Id.* at 68–71; 134. Michael explained that he obtained the fryer because ABC Agent Daniel Dunlap[2] told him, "I want you to have a fryer and I'll approve your kitchen."

---

[2] Dunlap has served as an ABC agent in Lafayette County, where Oxford is located, since 2010 or 2011. Doc. #60-1 at 7.

*Id.* at 60. According to Michael, the ABC was "trying to help Mr. Boutwell, they were also trying to help me, and they were trying to get us up and going." *Id.*

On June 17, 2013, following an on-site inspection of Rooster's, Agent Dunlap sent a letter to the ABC recommending approval of Rooster's proposed kitchen space. Doc. #60-2 at 45, Ex. 3. A week later, on June 24, 2013, Michael submitted an application to renew his Alcoholic Beverage Permit. Doc. #60-1 at Ex. 4 at 1. The application, which included a Food Establishment Inspection Report from the Department of Health, claimed that Rooster's made 30.1% of its income from food sales from May 2012 through May 2013.[3] *Id.* at Ex. 4 at 2, 4. Following an audit of Rooster's sales numbers,[4] the ABC renewed Rooster's Alcoholic Beverage Permit, and Grillehouse opened with its own permit.[5] Doc. #60-1 at 23; Doc. #60-2 at Ex. 4; Doc. #62-3 at 73–74.

### E. ABC Enforcement and Boutwell's Communications with Agent Dunlap

Approximately three weeks after the installation of the fryer, Michael purchased an identical fryer for permanent use. Doc. #62-2 at 68. In July or August 2013, the purchased fryer stopped working and was sent out for repair. *Id.*

One day after the fryer was sent for repair, Dunlap performed an inspection at Rooster's and stated that "he got a complaint on [the] kitchen." *Id.* Given the short time between the fryer being sent for repair and Dunlap's appearance, Michael felt it was "pretty obvious" that Boutwell had filed the complaint. *Id.* Dunlap could not recall whether Boutwell had lodged the complaint

---

[3] According to Dunlap, the time frame for sales numbers should run "permit year to permit year." Doc. #60-1 at 26.

[4] Dunlap testified at his deposition that the audit would have been conducted because the renewal application showed a 30% food sales percentage. Doc. #60-1 at 23.

[5] Boutwell explained that he could not obtain a liquor license until the license was "relieved from [Michael]. He couldn't get it relieved until he had an approved kitchen, which is not only approved by the ABC, but the state health department." Doc. #62-3 at 73.

regarding the fryer.  Doc. #60-1 at 106.  Boutwell testified that he informed Dunlap that, at one

point, Rooster's had been leasing a fryer and that the lease had expired.  Doc. #62-3 at 71.

Boutwell and Dunlap communicated through text messages for much of December 2013

through May 2014.  *Id*. at Ex. 1.  Of relevance to these proceedings, they exchanged the

following text messages:

> Boutwell (12/14/13, 11:18 p.m.):  Rumor has it Scott is having his private
> Christmas party tomorrow Night upstairs.  Not sure what the law is on serving
> liquor on Sunday is even if its private.  Would be a great time to inspect if its not
> legal.
>
> Dunlap (12/15/13, 8:13 a.m.): He has permission to have his christmas party
> during those hours
>
> Boutwell (12/15/13, 8:14 a.m.):  Ill be damned.  I would have bet the farm he
> didn't!  Haha
>
> Boutwell (1/23/14, 1:52 p.m.):  R u sneaking into Oxford tonight?  Clint
>
> Dunlap (1/23/14, 5:26 p.m.):  Not that i know of.  Unless i receive good info that i
> need to
>
> Boutwell (1/23/14, 5:39 p.m.):  I wish I had some!  Should be a great audit this
> year tho.  Out sourcing all his cooked food from other places.  Food orders
> average $125 a week[6]
>
> Dunlap (1/23/14, 5:40 p.m.):  Good for him
>
> Boutwell (1/23/14, 5:40 p.m.):  Yep
>
> Boutwell (2/19/14, 4:19 p.m.):  When r renewals for lic due?  Clint
>
> Dunlap (2/19/14, 4:31 p.m.):  Within 10 days of expiration.  Usually get a renewal
> notice in mail a couple months before
>
> Boutwell (2/19/14, 4:33 p.m.):  Gotcha.  Well my neighbor's aloha system 'burnt
> up' a few days ago.  Tragic all those records of sales were lost

---

[6] In their summary judgment brief, Plaintiffs contend that Boutwell admitted that "he really didn't know that this
was true."  Doc. #63 at 10.  However, on this point, the brief cites to a portion of Boutwell's deposition not included
in the record.

Boutwell (3/5/14, 7:26 a.m.): Scott is getting his food catered over by Petra café now. A little crap restaurant next door. He fired his 1 nacho maker! I can't wait til u bust his ass. He is such a prick!!

Boutwell (3/20/14, 10:17 p.m.): Try it on a Monday, I hear that's their night. But maybe in a few weeks u can come by to approve my new lease

Boutwell (3/27/14, 3:23 p.m.): Got it. Thanks. It looks perfect.[7] Also, Petra café across the street is cooking roosters food and walking it over to order. My manager as seen them walk over with wings and pizza and a buffet dish full of food. You can look at their Sysco purchases too. Only juice and coke products

Boutwell (4/1/14, 9:56 a.m., attaching pictures):[8] Hard to see but this was last night Petra guy walking over food. In the white shirt.

Dunlap (4/1/14, 10:10 a.m.): Got this on my calendar to work on next week.

Boutwell (4/1/14, 10:10 a.m.): Sweet

Dunlap (4/5/2014, 3:14 p.m.): Pat daily 3 people at 600 tonight

Dunlap (4/5/2014, 3:21 p.m.): Got it. Don't tell people u got a reservation. I don't take but for 8 or more and none this weekend! Haha

Dunlap (4/5/2014, 3:22 p.m.): Ok. Thanks[9]

Boutwell (4/11/14, 6:24 p.m., attaching pictures): There ya go

Boutwell (4/24/14, 11:25 a.m.): When u showing up this week?

Boutwell (5/13/14, 12:34 p.m.): Still hungry for wings & pizza tonight??

Dunlap (5/13/14, 12:35 p.m.): Yea. Teaching a class there today and sending my guy tomorrow.

Boutwell (5/13/14, 12:35 p.m.): Nice

---

[7] It is unclear what Boutwell is referring to in this message.

[8] Beginning April 1, 2014, Dunlap and Boutwell texted between Dunlap's work and personal phones. *See* Doc. #60-1 at Ex. 14. Dunlap explained that he uses both phones because "[i]t's a little bit easier on my iPhone to text … my work phone is a flip phone and it takes forever to type text messages." *Id.* at 66.

[9] Dunlap testified that his "boss was looking … for a place to take his son for his birthday and his son wanted a steak. He called and asked which steak houses were in Oxford. I said we had the Oxford Grillehouse[,] Boure[, and] City Grocery. And he told me that they wanted to try Oxford Grillehouse and wanted to know if they took reservations." Doc. #60-1 at 119.

Dunlap (5/13/14, 12:36 p.m.):  No excuse to not know the rules then

Boutwell (5/13/14, 12:39 p.m.):  Just a blatant disregard for the rules.  When does his lic expire?

Dunlap (5/13/14, 12:39 p.m.):  June or july

Boutwell (5/13/14, 12:40 p.m.):  Lets get this over with I have much to do!!

Dunlap (5/13/14, 12:41 p.m.):  I hear ya

Boutwell:  (5/14/14, 2:49 p.m.) 2 dozen wings some fried rice and a pizza please!!

Boutwell (5/15/14, 9:08 p.m.):  Wings just walked by!  Ha

Dunlap (5/15/14, 9:22 p.m.):  Doesn't surprise me.  I have meeting with him Monday.  He acted all shocked on phone today.

Boutwell (5/15/14, 9:24 p.m.):  Shocked?  That's funny!  Shocked he got caught maybe!

Dunlap (5/15/14, 9:25 p.m.):  He didn't see anything wrong.  Thought he was doing like we told him to.

Boutwell (5/15/14, 9:28 p.m.):  Dumb ass.  He's always right.

Dunlap (5/15/14, 9:39 p.m.):  I told him what he was doing was no different than what he wanted to do with you except now he had to cross the road.

Boutwell (5/15/14, 9:39 p.m.):  And he said?

Dunlap (5/15/14, 9:40 p.m.):  He didn't see it that way.  Says he has food receipts

Boutwell (5/15/14, 9:47 p.m.):  He's smarter than you.

Boutwell (5/19/14, 10:11 a.m.):  U still have that meeting today?

Dunlap (5/19/14, 10:10 a.m.):[10]  Yep.  2:00

Boutwell (5/19/14, 10:25 a.m.):  Lay it on his ass!!

*Id*. (footnotes added, spelling and grammatical errors in original).

---

[10] Strangely, the time stamps on these messages show the response occurring before the question.

When questioned about these text messages during his deposition, Dunlap denied ever asking Boutwell to "check on Scott in any fashion." Doc. #60-1 at 111. Rather, Dunlap testified that it is common to receive complaints from business owners in Oxford regarding other business owners. *Id.* at 60–61. According to Dunlap, "[e]verybody's complaining about everybody. I guess competition's heavy in Oxford." *Id*. at 61. He explained that "[if] it's credible information, then we look at it. We do our own investigation, but we never take action based on just somebody tattling." *Id*. Dunlap denied ever planning with Boutwell to audit or investigate Rooster's. *Id*. at 62. Dunlap claimed that when Boutwell made complaints, he only acted on those which "after our own independent investigation warranted further checking …." *Id*. Dunlap also denied taking any action as to Rooster's "because of any predisposed plan …." *Id*.

As for the Petra investigation mentioned in his texts with Boutwell, Dunlap testified that after Boutwell contacted him "several times over the course of maybe a couple of weeks or a month … I directed an ABC agent to go to … Rooster's and buy food and we sat nearby to watch to see if it was coming across the street from Petra." *Id*. at 78. Dunlap observed the Rooster's employee preparing the food walk over to Petra's and "got some condiments," but that he did not see any "actual food coming across the street." *Id*. at 79.

After the Petra investigation, Dunlap informed either Michael or Rooster's manager that they "had received a complaint … and if he was getting food across the street that he couldn't …." *Id*. According to Dunlap, "they said … yes … we have been cooking wings and things and we would carry across the street. So I let them know that you can't do that. You ain't cooking it here, you can't sell it here." *Id*. Dunlap remarked that "actions and discussions related to specific enforcement issues with a business" should not be discussed with other business owners; however, he could not recall whether this prohibition was ABC policy. *Id.* at 76–77.

At some point, Michael complained to Dunlap's supervisor that "he felt like he was being picked on." *Id.* at 114.

### F. Boutwell's Desire to Move Upstairs and Statements about Michael

At an unspecified time, Boutwell began speaking openly about his desire to take over the second floor space in the Building. Boutwell would make statements to Paul Littrell, the former bartender[11] at Grillehouse, that began "when we take over upstairs … ." Doc. #62-6 at 4. Boutwell also told his former manager,[12] Jeffrey Mote, that he "wanted" the space upstairs. Doc. #62-5 at 6; Doc. #62-3 at 40. Boutwell told Mote that he "was going to get [Michael] shut down for selling to minors." Doc. #62-5 at 13. According to Mote, Boutwell stated that he wanted to send a minor to Rooster's to see if the minor would be served alcohol.[13] *Id.* at 15. Additionally, Boutwell informed Mote that "he was in constant contact with Daniel Dunlap regarding …. issues with Rooster's." *Id.* at 6.

Related to these statements, Boutwell informed unnamed people that Rooster's and Michael sold alcohol to minors. Doc. #62-3 at 50. He also told Mote that Michael was a drunk. Doc. #62-5 at 7.

### G. Plaintiffs' Eviction Efforts

In September 2013, Michael and his attorney drafted an eviction notice which was delivered to Boutwell. Doc. #62-2 at 55–56. Sometime later, Michael's attorney sent Boutwell's attorney a letter withdrawing the notice of eviction. *Id.* at 83.

---

[11] Littrell left Grillehouse in January or February 2015 because he "didn't feel comfortable working for [Boutwell] anymore." Doc. #62-6 at 4.

[12] Mote left Grillehouse sometime in early 2014 due to a "hostile work environment." Doc. #62-5 at 11, 16–17. He left while Boutwell was considering the termination of his employment. *Id.* at 17.

[13] Mote was unaware of whether Boutwell followed through on this plan. Doc. #62-5 at 15.

In March 2014, Michael sent Boutwell a second letter notifying him that the sublease was being terminated. *Id*. at 72, 81. Despite the notice, the contract was not terminated. *Id*. at 75–76.

### H. Plaintiffs' Institution of Suit

On May 30, 2014, Plaintiffs filed a complaint in this Court alleging that Boutwell and Grillehouse: (1) breached a contract with Plaintiffs to install a kitchen and/or provide food to Plaintiffs' restaurant (Rooster's); (2) defamed Plaintiffs; (3) defrauded Plaintiffs into entering a lease agreement for space in Defendants' building; and (4) acting through the Mississippi Alcohol Bureau Commission ("ABC"), violated Plaintiffs' Fourteenth Amendment rights.[14] *See* Doc. #1 at ¶¶ 36–47. On July 16, 2014, Defendants moved to dismiss Plaintiffs' complaint for failure to state a claim. Doc. #4. The motion to dismiss included a request for sanctions. *Id*.

### I. 2014 ABC Renewal and Department of Revenue Notification

Meanwhile, on June 17, 2014, Michael submitted an application for renewal of his ABC permit. Doc. #60-1 at Ex. 5. The application reported food sales totaling 8.62% of total income from January 2013 through December 2013. *Id*. at Ex. 5 at 2. The application included a note from Michael stating:

> In 2013 Rooster's Blues House, LLC maintained a full service kitchen until May 2013 upon subleasing part of their building space. Unexpectedly, Rooster's did not re-open a new full service kitchen until August 2013. As a result, restaurant sales did not begin to recover until January 2014.

*Id*. at Ex. 5 at 8. The ABC approved Michael's renewal application. *Id*. at Ex. 5 at 13.

---

[14] Plaintiffs filed their initial complaint about two months after Michael's notice to Boutwell that the sublease was being terminated, although no termination resulted. *See* Doc. #62-2 at 72.

On July 21, 2014, J. Ed Morgan, Commissioner of Revenue for the Mississippi Department of Revenue, sent Michael a letter notifying him that he had been determined to be in violation of the 25% food sale requirement. *Id.* However, the letter provided:

> [B]ased on on-going litigation that has allegedly affected your business operation as well as the allegations that a third party has purposefully taken action to keep Rooster's from maintaining sufficient food sales, it is my decision to issue a written reprimand on this violation and allow additional time for you to bring Rooster's into compliance …. At the expiration of your current permit in 2015, your records will be subject to review by Department of Revenue personnel. If you are not in compliance, you may face suspension or revocation of your on-premise retailer's permit.

*Id.* at Ex. 6. In addition to this admonition, the letter set forth five "issues" for Rooster's to address "in a meaningful manner." *Id.* These issues related to: (1) the food sales requirement; (2) record keeping; (3) the installation of adequate kitchen equipment, including an oven and stove top, cold storage areas, a ventilation hood, food preparation areas, a mop sink, three compartment sinks, and handwashing facilities for employees; (4) Rooster's menu; and (5) the possibility of implementing a "complimentary buffet option." *Id.* Based on this letter, Plaintiffs began construction on a new kitchen in Rooster's. Doc. #62-2 at 98.

## J.    February 2015 Inspection

On February 5, 2015,[15] twelve or thirteen ABC agents traveled to Oxford to perform a "sweep." Doc. #60-1 at 91–92. According to Dunlap, the normal procedure for a sweep is for the agents to "walk into different bars and … identify people who … we believe look to be under the age of 21 and we ask to see their ID if they're in possession of alcoholic beverages or beer. [We] find fake ID violations that way. We find minor in possession violations that way." *Id.* at 92.

---

[15] During his deposition, Dunlap did not specifically provide the year the sweep occurred. However, he testified that the sweep occurred on a Thursday night and near the date of his deposition. Doc. #60-1 at 94–95. Dunlap was noticed for a deposition in February 2015. Doc. #42. Additionally, February 5, 2015, fell on a Thursday.

That evening, the agents split into two groups and swept through multiple bars in Oxford. *Id*. at 94.  At the end of the night, eleven or twelve of the agents converged on Rooster's.  *Id*. at 92.  Rooster's was the only bar that experienced a sweep with that many agents.[16]  *Id*. at 94. Dunlap testified that the two teams of agents started at opposite ends of the square and "met in the middle by the end of the night ….  Right there on the corner by Rooster's."  *Id*.

## K.  Amended Complaints and Subsequent Motions

On July 31, 2014, while Defendants' motion to dismiss was pending, Plaintiffs filed an amended complaint against Defendants.  Doc. #12.  The amended complaint contained more detailed factual allegations than the original complaint,[17] but asserted the same four general classes of claims.  *See id*.  On August 4, 2014, Defendants moved to dismiss the amended complaint for failure to state a claim.  Doc. #12.

On February 19, 2015, this Court issued an order striking Plaintiffs' amended complaint as a shotgun pleading that "wholly fail[ed] to plead which alleged facts support which causes of action."  Doc. #48 at 9.  In addition to striking the amended complaint, the February 19 order: (1) denied Defendants' motions to dismiss as moot; (2) denied Defendants' motion for sanctions as moot; and (3) directed Plaintiffs to file a second amended complaint within fourteen days of the entry of the order.  *Id*. at 10–11.  In directing Plaintiffs to file a second amended complaint, this Court noted:

> The Fifth Circuit has recognized that a private party may be liable as a state actor for filing a complaint if the actual state actor who harmed the plaintiff: (1) "acted in accordance with a 'preconceived plan' to take the action "merely because [the action] was designated ... by the private party[;]" and (2) the state actor did so "without independent investigation."  *Sims v. Jefferson Downs Racing Ass'n, Inc.*,

---

[16] In their brief in response to Defendants' second motion to dismiss, Plaintiffs make allegations regarding the conduct of the officers while in Rooster's.  *See* Doc. #63 at 12.  As support for these allegations Plaintiffs cite a document identified as "Affidavit of Zach Clolinger."  *Id*.  No such document appears in the evidentiary record.

[17] A detailed summary of the factual allegations may be found in this Court's February 19, 2015, order.  Doc. #48.

> 778 F.2d 1068, 1078–79 (5th Cir. 1985). Plaintiffs are cautioned that a failure to adequately plead sufficient facts to support such alleged state action in this case will likely result in the dismissal of this action for lack of jurisdiction.

*Id*. at 10 n.4.

Plaintiffs did not file a second amended complaint within the time allowed and, on March 6, 2015, this Court issued an order to show cause "why this action should not be dismissed without prejudice for failure to comply with a court order." Doc. #54 at 1. The same day Plaintiffs' responded to the order to show cause by submitting an affidavit of their attorney stating that on March 5, 2015, the filing deadline for the second amended complaint, he was unable to leave his house or access the internet due to an ice storm the previous evening. Doc. #55. In addition to the affidavit, Plaintiffs filed their second amended complaint.[18] Doc. #56. Plaintiffs' second amended complaint alleges the same facts and causes of action as the first amended complaint but links specific factual allegations to the asserted claims. *Id*. The complaint also contains an allegation related to the February 2015 sweep. *Id*.

On March 23, 2015, Defendants filed a motion to dismiss for failure to state a claim, or in the alternative, for summary judgment, regarding Plaintiffs' second amended complaint. Doc. #59.

On April 16, 2015, Plaintiffs filed a "Motion to Strike Defendants' Answer and for Sanctions Because of Defendant Boutwell's Threat to a Key Witness." Doc. #65. In their motion, Plaintiffs allege that, on the morning of April 9, 2015, Boutwell attempted to provoke a fight with Mote and then, when the provocation failed, issued a threat to Mote. *Id*. On May 4, 2015, Defendants filed a response and memorandum opposing the motion for sanctions. Doc. #68; Doc. #69. Plaintiffs filed a reply on May 11, 2015. Doc. #71.

---

[18] While the Court does not approve of the late filing, given the circumstances which caused the delay and the absence of objection by Defendants, the second amended complaint is deemed properly filed.

On May 12, 2015, Defendants filed a motion to dismiss Plaintiffs' second amended complaint for lack of jurisdiction. Doc. #72. Plaintiffs timely responded to the motion and Defendants timely replied. Doc. #76; Doc. #79. On May 15, 2015, United States Magistrate Judge S. Allan Alexander stayed this case pending resolution of the jurisdictional motion. Doc. #75.

On June 24, 2015, this Court held an evidentiary hearing on Plaintiffs' motion for sanctions. Doc. #80.

## II
## Pending Motions Approach

As stated above, there are three motions currently pending in this action: (1) Defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, or for summary judgment, Doc. #59; (2) Plaintiffs' motion for sanctions, Doc. #65; and Defendants motion to dismiss for lack of jurisdiction under Rule 12(b)(1), Doc. #72.

Where "a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). This rule also applies when a 12(b)(1) motion is filed in conjunction with a motion for summary judgment. *Cupit v. U.S.*, 964 F.Supp. 1104, 1106 (W.D. La. 1997) ("[W]e must determine if subject matter jurisdiction is present before considering the substantive arguments of the summary judgment motion.") (citing *Stanley v. Ctr. Intelligence Agency*, 639 F.2d 1146, 1156–57 (5th Cir. 1981)).

Likewise, while a Court acting under its inherent powers may issue sanctions collateral to the merits, "[w]here jurisdiction is found to be lacking, there can be no adjudication of the merits of the case. This prohibition must bar the imposition of a sanction which will terminate the case on the merits." *In re Orthopedic "Bone Screw" Prods. Liab. Litig.*, 132 F.3d 152, 157 (3d Cir.

1997).  "A default judgment is a judgment on the merits that conclusively establishes the defendant's liability."  *U.S. for the use of M–CO Constr., Inc. v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987).

Accordingly, before considering the 12(b)(6), summary judgment, and sanctions motions, the Court must first determine whether it has jurisdiction over the action.  If jurisdiction is found, a potentially dispositive sanctions motion should next be addressed before resolving the case on the merits. *See Smith v. Bank of America, N.A.*, No. 2:11-cv-676, 2014 WL 897032, at *3 (M.D. Fla. Mar. 6, 2014) ("The Court will first address defendants' motion for final dismissal or spoliation sanctions followed by the cross-motions for summary judgment.").  Thus, if the Court has jurisdiction, it will address Plaintiffs' motion for sanctions before turning to Defendants' motion to dismiss for failure to state a claim, or in the alternative, for summary judgment.

### III
### Jurisdiction

In their memorandum accompanying their jurisdictional motion, Defendants contend that Plaintiffs cannot show that Defendants acted under color of state law and that, "[w]ithout the Defendants being state actors, the Plaintiffs cannot bring a case pursuant to [42 U.S.C.] § 1983, and the Court lacks jurisdiction over the subject matter of this case."  Doc. #73 at 6.

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014).  With few exceptions, none of which are relevant here, subject matter jurisdiction in federal court is conferred through either federal question jurisdiction, pursuant to 28 U.S.C. § 1331; or diversity jurisdiction, pursuant to 28 U.S.C. § 1332.  Here, there is no dispute that the parties are not diverse so as to implicate diversity jurisdiction, so the sole

question presented is whether Plaintiffs' complaint invokes federal question jurisdiction under 28 U.S.C. § 1331.

28 U.S.C. § 1331 provides district courts with "original jurisdiction of all actions arising under the Constitution, laws, or treaties of the United States." "To determine whether a case is one 'arising under' federal law for these purposes, [courts] ordinarily apply the well-pleaded complaint rule." *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 328 (5th Cir. 2008) (internal citations omitted). The well-pleaded complaint rule provides:

> [W]hether a case is one arising under the Constitution or a law or treaty of the United States, in the sense of the jurisdictional statute, … must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose.

*Id.* (alterations in original) (*quoting Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 10 (1983)).

There is no dispute in this case that Plaintiffs' amended complaint, on its face, contains constitutional claims asserted through the vehicle of 42 U.S.C. § 1983. *See* Doc. #56 at ¶ 4. Defendants, however, arguing that Plaintiffs cannot prove that they acted under color of state law, contend the allegations underlying the § 1983 claims are frivolous and that, therefore, the § 1983 claims are irrelevant for determining jurisdiction. Doc. #73 at 3.

Under *Bell v. Hood*, 327 U.S. 678, 681–82 (1946), "[i]n federal question cases … where the complaint is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions[,] must entertain the suit. The two exceptions are where the federal question clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Southpark Square Ltd. v. City of Jackson*, 565 F.2d 338, 341 (5th Cir. 1977) (internal

punctuation, quotation marks, and citations omitted) (quoting *Bell*, 317 U.S. at 681–82). The

Fifth Circuit has interpreted this rule as applying "only where the plaintiff's claim has no

plausible foundation or is clearly foreclosed by a prior Supreme Court decision." *Williamson v.*

*Tucker*, 645 F.2d 404, 416 (5th Cir. 1981) (internal quotation marks omitted); *see also Young v.*

*Hosemann*, 598 F.3d 184, 188 (5th Cir. 2010). If a claim meets this two-part test it is said to be

"non-frivolous" and jurisdiction attaches.[19] The test "is a rigorous one and if there is any

foundation of plausibility to the claim federal jurisdiction exists." *Southpark Square Ltd*, 565

F.2d at 342–43.

Insofar as Defendants have challenged jurisdiction here based on Plaintiffs' failure to

show state action under § 1983, the Court must first decide whether such claim either lacks a

plausible foundation or is clearly foreclosed by a prior Supreme Court decision. *See Eubanks v.*

*McCotter*, 802 F.2d 790, 793 (5th Cir. 1986) (applying *Bell* test to § 1983 claims); *see also*

*Young*, 598 F.3d at 188 (same). If so, dismissal for lack of jurisdiction is required. *Young*, 598

F.3d at 188. If the claim is non-frivolous (plausible and not foreclosed by Supreme Court

precedent), the jurisdictional motion should be treated as a motion under Rule 12(b)(6). *See*

*Eubanks*, 802 F.2d at 794 ("Because the federal causes of action in appellants' complaint were

neither immaterial nor frivolous, the district court erred in dismissing this case for lack of subject

matter jurisdiction."); *Sanchez v. Thompson*, No. 07-cv-531, 2007 WL 4574727, at *2 (E.D.N.Y.

Dec. 26, 2007) ("[C]ourts have repeatedly held that the question of whether the Section 1983

---

[19] While "frivolous" appears in the two part test, the use of "non-frivolous" has become shorthand for a jurisdiction-conferring claim. *See Broussard v. U.S. Postal Serv.*, 674 F.2d 1103, 1113 n.7 (5th Cir. 1982) ("Because Broussard's claim against the individual defendants is nonfrivolous and it 'arises under' the federal constitution, the district court technically erred by dismissing … for lack of jurisdiction …."); *see also City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1006 (9th Cir. 2010) ("Any non-frivolous assertion of a federal claim suffices to establish federal question jurisdiction, even if that claim is later dismissed on the merits."); *Quinn v. Gates*, 575 F.3d 651, 655 (7th Cir. 2009) ("Any non-frivolous claim arising under federal law supplies jurisdiction."). The Court will use the term "non-frivolous" to refer to a claim that passes the Fifth Circuit's two-part jurisdiction test.

elements have been alleged, including state action, not be analyzed as a jurisdictional motion.") (collecting cases).

A claim may fail the *Bell* test on the face of the complaint or the evidentiary record. *See Johnson v. Hood*, 430 F.2d 610, 612 n.6 (5th Cir. 1970) ("[W]hen the pleadings and the proof adduced combine at any stage of a proceeding to demonstrate that the claim presented is insubstantial or frivolous, jurisdiction then fails."); *Fragumar Corp., N.V. v. Dunlap*, 685 F.2d 127, 129 (5th Cir. 1982) ("[E]videntiary material submitted … might be so overwhelming that the district court might properly label 'frivolous' the invocation of federal jurisdiction."); *Sarmiento v. Tex. Bd. of Veterinary Med. Exam'rs ex rel. Avery*, 939 F.2d 1242, 1246 (5th Cir. 1991) (finding lack of jurisdiction over § 1983 claim where "nowhere in the complaint does Sarmiento allege that [defendant] was engaged in any conspiracy with the governmental officials or employees"). Thus, the Court will first consider whether the § 1983 claims are implausible or foreclosed on the face of the complaint. If the claims are non-frivolous, the Court will determine jurisdiction based on the evidentiary record.

## A. § 1983 Causes of Action

42 U.S.C. § 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects or causes to be subjected, any … person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." "There are three elements to establish liability through a Section 1983 action. There must be (1) a deprivation of a right secured by federal law; (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir.

2004) (internal footnote omitted). Defendants' motion only challenges jurisdiction on the ground that Defendants are not state actors.[20] *See* Doc. #73.

### B. Allegations on Face of Complaint

Like Plaintiffs' earlier complaints, their second amended complaint alleges that Boutwell and Grillehouse fraudulently induced Michael and Rooster's into entering a contract for Grillehouse's use of the Building's first floor and basement and that, following execution of the contract, Defendants undertook a series of wrongful acts, including defaming Plaintiffs, breaching the contract, and causing the ABC to investigate and audit Rooster's. Doc. #56.

In support of the § 1983 claim, the second amended complaint alleges: (1) Boutwell would frequent Plaintiffs' bar "to scout out anything he could think of that he could report to Mississippi Alcohol Beverage Control Commission agents, whether it was accurate or not, to try and get the Plaintiffs in trouble;" (2) Boutwell reported to the ABC that Rooster's did not have any food in their establishment and that an ABC agent acted on this tip; (3) "Boutwell has told a number of people words to the effect that he … owned the ABC and that they would do whatever he wanted;" (4) Boutwell "was aware" that Rooster's fryer was broken and "[s]hortly after the fryer was sent away for repair, ABC agents arrived to check Rooster's kitchen area to make sure that everything was working [and] asked to see Rooster's food sales numbers;" (5) "[a]n ABC agent told Michael that they acted on reports of problems;" (6) Rooster's experienced "regular friction with the ABC related to food, and was put so far behind by Boutwell's actions that it has been very difficult to make up the required food sales numbers;" (7) Boutwell told a number of people that he was going to make a video of Rooster's bringing in food from another restaurant and "[s]hortly thereafter, an agent of the ABC came to Rooster's and told them that he had video

---

[20] Of course, this does not relieve the Court of inquiring into the overall frivolity of the § 1983 claims. *See Jones v. U.S.*, 625 F.3d 827, 829 (5th Cir. 2010) ("Although the parties now agree that the district court had jurisdiction over Jones's claims, this court must determine subject-matter jurisdiction for itself.").

of [another] restaurant carrying food across the street [to Rooster's];" (8) Boutwell has "repeatedly told people that the ABC agents do what he wants and that is how he is going to get Rooster's shut down;" (9) "Boutwell's actions have caused Rooster's to be audited for food sales twice;" (10) Boutwell received texts from an ABC agent "giving Boutwell confidential information about Rooster's and about when [the agent] would carry out supposed surprise visits to Oxford;" (11) "Boutwell told the agent that he wanted the agent to close Rooster's down, with the agent acknowledging his efforts to do so;" and (12) "11 or 12 ABC agents came into Rooster's and largely stood around for an hour, until the place was almost emptied of customers, knowing that would be the effect." Doc. #56 at ¶¶ 21–23, 25–30, 33–34, 45, 48. Based on these allegations, the second amended complaint avers that "[i]n effect, Boutwell conspired with and directed the agent in order to have Rooster's shut down so that he could take over the business." *Id.* at ¶ 45.

Plaintiffs further allege that Boutwell's actions in allegedly directing the ABC's activities: (1) "constitute a taking in violation of the Plaintiffs' procedural due process rights under the 14th amendment to the United States Constitution;" (2) "constitute selective enforcement in violation of the equal protection clause to the 14th amendment;" and (3) "constitute a violation of the plaintiffs' substantive due process rights under the 14th amendment." Doc. #56 at ¶¶ 47–49.

### C. Face of Complaint Analysis

As explained above, the three elements of a § 1983 claim are: "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W.*, 369 F.3d at 482. There is no dispute that, insofar as Plaintiffs seek recovery for the actions of the ABC's audits, investigations, and administrative actions, that the alleged

deprivations occurred under color of state law. Accordingly, the question becomes whether Defendants may properly be considered state actors and whether the ABC's actions resulted in a deprivation of a right secured by federal law.

## 1. State Actor

In *Lugar v. Edmondson Oil Company*, 457 U.S. 922, 936 (1982), "[t]he Supreme Court set forth a two-part test for determining whether the deprivation of a federal right could fairly be attributable to the state:"

> (1) "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible"; and (2) "the party charged with the deprivation must be a person who may fairly be said to be a state actor," and "[t]his may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State."

*Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2010) (quoting *Lugar*, 457 U.S. at 937). Under this framework, "[f]or a private citizen … to be held liable under section 1983, the plaintiff must allege that the citizen conspired with or acted in concert with state actors." *Priester v. Lowndes Cty.*, 354 F.3d 414, 420 (5th Cir. 2004).

To plead a § 1983 claim against a private citizen based on a theory of conspiracy, "[t]he plaintiff must allege: (1) an agreement between the private and public defendants to commit an illegal act and (2) a deprivation of constitutional rights." *Priester*, 354 F.3d at 420. "Allegations that are merely conclusory, without reference to specific facts, will not suffice." *Id*. In this vein, a private party may be liable as a state actor for filing a complaint with law enforcement if the actual state actor who harmed the plaintiff: (1) "acted in accordance with a 'preconceived plan' to take the action "merely because [the action] was designated ... by the private party[;]" and (2) the state actor did so "without independent investigation." *Sims*, 778 F.2d 1078–79; *see also*

*Dennis v. Sparks*, 449 U.S. 24, 29 (1980) ("Of course, merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge. But here the allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge.").

As a general matter, where courts have found a claim frivolous based on lack of state action, the court has noted a *complete* lack of allegations regarding state action. *See Deleo v. Rudin*, 328 F.Supp.2d 1106, 1111–12 (D. Nev. 2004) (no jurisdiction where plaintiff "presented no evidence or argument that [defendant] was acting under color of state law); *see also Gause v. Chase Bank N.A*, No. 11-cv-6107, 2012 WL 847816, at *3 (E.D.N.Y. Mar. 12, 2012) (finding § 1983 claim did not invoke federal jurisdiction where "all of the defendants are private persons or corporations *not alleged to have any connection with any government body*") (emphasis added); *see also Baize v. Lloyd*, No. 14-cv-02573, 2014 WL 6090324, at *3 (S.D. Cal. Nov. 13, 2014) (no jurisdiction where "Plaintiff has not alleged or even indicated that Defendant was acting under color of state law").

Here, Plaintiffs have alleged that Boutwell claimed that he controlled the ABC, that he informed the ABC that he wanted Rooster's shut down, that the ABC acted on Boutwell's complaints and provided Boutwell with information on the status of the investigation, and that such constitutes a conspiracy between Boutwell and the ABC agent. Based on these allegations, the Court cannot conclude that the allegations of conspiracy and unlawful direction are so completely without merit as to deprive this Court of jurisdiction. Put differently, these allegations suffice regarding the possibility that the ABC investigated and audited Rooster's based solely on Boutwell's direction and are, therefore, non-frivolous. The existence of state

action then is neither lacking in plausible foundation nor clearly foreclosed by Supreme Court precedent.

## 2. Constitutional Deprivations

Plaintiffs allege constitutional deprivations of their: (1) substantive due process rights; (2) procedural due process rights; and (3) rights to be free from selective enforcement. Doc. #56 at 47–49.

### a. Substantive Due Process

"A plaintiff seeking to recover for a substantive due process violation must show '(1) that he was deprived of a life, liberty, or property interest (2) in an arbitration and capricious manner.'" *Vincent v. City of Sulphur*, 28 F.Supp.3d 626, 642 (W.D. La. 2014) (quoting *Saucedo-Falls v. Kunkle*, 299 Fed. App'x 315, 319 (5th Cir. 2008)). "Liberty interests may be created under either federal law or state law." *Jennings v. Owens*, 602 F.3d 652, 657 (5th Cir. 2010). "Because the constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (internal quotation marks omitted). Here, Plaintiffs allege that Defendants violated their substantive due process rights by "[i]ntentionally destroying" Rooster's business. Doc. #56 at ¶ 49.

Courts have recognized "a constitutionally protected liberty interest in pursuing a chosen occupation." *Stidham v. Tex. Comm'n on Private Sec.*, 418 F.3d 486, 491 (5th Cir. 2005). This liberty interest includes the "right to follow this chosen business or occupation free from unreasonable governmental interference …." *Ferrell v. Dallas Indep. Sch. Dist.*, 392 F.2d 697, 703 (5th Cir. 1968). The Fifth Circuit has held that the liberty interest in pursuing a chosen

occupation is violated when a government actor takes actions which *directly* dissuade customers from patronizing a private business. *See San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 703–04 (5th Cir. 1991) ("In this case, the record contains summary judgment evidence demonstrating that neither the alleged defamation alone nor the free choice of private citizens caused Kacal's decline in patronage. Instead, the record contains evidence that the police officers' continual harassment of Kacal's young and easily intimidated patrons caused the decline in patronage."). Such acts may also support a claim for deprivation of a plaintiff's reputation interests. *Id.*

While it may be unlikely that the acts complained of in the complaint rise to the level of unreasonable governmental interference,[21] the Court cannot conclude that Plaintiffs' allegations, which allege, among other things, that officers harassed customers causing a loss of business in order to close Plaintiffs' business, are so wholly without merit as to remove the claim from this Court's jurisdiction.

Additionally, while Plaintiffs acknowledge that they did not lose their license in defending against the ABC's actions allegedly caused by Defendants, they allege that they spent money in preparing for the audit. Doc. #56 at ¶ 34. Courts that have considered the issue have declined to hold that a plaintiff has a property interest in defending against wrongful administrative actions. *See Powell v. Fujimoto*, 119 Fed. App'x 803, 806 (7th Cir. 2004) (collecting cases). This Court has been unable to find Fifth Circuit or Mississippi Supreme Court authority on this issue.[22] Thus, while it is unlikely Plaintiffs' have a property interest in the fees

---

[21] In *Kacal*, the Fifth Circuit distinguished out-of-circuit authority by noting that the "concerted actions of the police [in harassing Kacal's customers] caused Kacal to lose so much of her business that she had to close her doors and default on her lease." 928 F.2d at 703. Plaintiffs have not suffered this type of loss.

[22] In *Ausin Municipal Securities., Inc. v. National Association of Securities Dealers, Inc*., 757 F.2d 676, 690 (5th Cir. 1985), the Fifth Circuit declined an opportunity to address this issue, choosing instead to base their decision on absolute immunity.

spent on the allegedly wrongful audit, the Court cannot conclude without reservation that such claim is wholly without merit.[23]

### b. Procedural Due Process

"To prevail on a procedural due process claim, a plaintiff must show 1) that he suffered a deprivation of a constitutionally protected interest in 'life, liberty, or property,' and 2) that such deprivation occurred without due process of law." *Vincent*, 28 F.Supp.3d at 637 (quoting *Zinermon v. Burch*, 494 U.S. 113, 125–26 (1990)). Due process of law requires consideration of: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest." *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

In identifying a deprivation of a constitutionally protected right, Plaintiffs cite again to the ABC's acts of investigating Rooster's, including the February 5 sweep, and auditing Rooster's for the purpose of closing the business. Doc. #56 at ¶ 47. Thus, for the same reasons above, the Court concludes that this claim invokes non-frivolous constitutional interests. Similarly, while it is somewhat unclear, it appears that Plaintiffs also allege that the process for undertaking the audit and sweep was constitutionally infirm insofar as the decision was made by Boutwell for the purpose of closing Plaintiffs' business. *Id*. at ¶ 45. This allegation is sufficiently non-frivolous to invoke jurisdiction.

### c. Selective Enforcement

"To establish a claim for selective enforcement under the Equal Protection clause, 'a plaintiff must prove that the government official's acts were motivated by improper

---

[23] While Plaintiffs seem to argue a property interest in their lease, Doc. #63 at 19, such a claim would necessarily fail insofar as it is undisputed Plaintiffs did not lose their lease.

considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right.'" *Craig v. City of Yazoo City*, 984 F.Supp.2d 616, 624 (S.D. Miss. 2013) (quoting *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000)); *see also Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 467 (5th Cir. 2015). While the Fifth Circuit has been skeptical of "class of one" selective enforcement claims, neither it (nor the United States Supreme Court) has explicitly rejected such a theory. *See Rogers v. Louisville-Winston Cty. Airport Auth.*, No. 1:13-cv-197, 2015 WL 1505843, at *3–4 (N.D. Miss. Mar. 31, 2015) (collecting authority). However, where courts have allowed class of one claims, they have required a showing that the plaintiff was treated differently from similarly situated persons. *Id.*

Plaintiffs, in the context of their selective enforcement claim, have alleged here that "[o]ther establishments have not been inspected or investigated nearly to the extent that Rooster's have [sic]." Doc. #46 at ¶ 48. This allegation is sufficient to bring the cause of action within the Court's jurisdiction based on selective enforcement. *See Warren v. Fisher*, No. 10-5343, 2013 WL 6805668, at *15, 21 (D.N.J. Dec. 20, 2013) (allowing class of one claim to proceed based on allegation that "increased site inspections were selectively targeted only against Plaintiffs").

### 3. Summary

Plaintiff's § 1983 claims are non-frivolous as pled. The Court must therefore decide whether the evidentiary material submitted is so overwhelming as to deprive the Court of jurisdiction over Plaintiffs' claims as frivolous.[24]

---

[24] To the extent the due process claims seem to rely heavily on acts arising after the filing of the complaint, it is unclear whether such claims may form an independent basis for this Court to exercise jurisdiction over the action. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) ("[T]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."). However, insofar as there is no dispute that the facts underlying the non-frivolous selective enforcement claim include conduct occurring before the filing of the complaint, the Court need not reach the question of whether the due process claims may establish jurisdiction on their own.

## D.   Evidentiary Record

As cited above, the Fifth Circuit has recognized that "evidentiary material submitted in support of … a motion might be so overwhelming that the district court might properly label 'frivolous' the invocation of federal jurisdiction." *Fragumar Corp., N.V.*, 685 F.2d at 129 (citing *Williamson*, 65 F.2d at 419 n.12).   However, the Court cautioned that dismissal for lack of jurisdiction is improper if "there is any substance at all to the claim …." *Id*.

Despite this rule having existed for decades, the Court has been unable to locate any Fifth Circuit authority actually finding lack of jurisdiction over a properly pleaded complaint based on contradictory evidence.[25]   There is little guidance then as to what "overwhelming" evidence might look like for the purpose of depriving this Court of jurisdiction.   What there is, however, is a mountain of case law granting summary judgment in favor of defendants on § 1983 claims on the grounds that the claims either were not brought against a state actor, *see, e.g. Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001); or because the claims did not implicate a constitutionally protected interest, *see, e.g., King v. Newton Cty. Bd. of Supervisors*, 144 Fed. App'x 381, 384 (5th Cir. 2005).   To the extent, as explained above, the grant of a summary judgment necessarily implies a finding of jurisdiction, it stands to reason that, in order to render a federal claim frivolous, evidentiary material must go beyond the summary judgment standard.   In other words, the frivolity inquiry requires something more than undisputed underlying facts and an evidentiary record revealing "no evidence from which reasonable persons might draw conflicting inferences about the facts,"[26] or where plaintiffs have presented

---

[25] The Court is aware of one case from the Central District of California that cited *Fragumar* and held that evidentiary material established the case did not involve securities which would bring it under the Securities Act of 1933 or the Securities Exchange Act of 1934. *Matek v. Murat*, 638 F.Supp. 775, 780–82 (C.D. Cal. 1986). However, *Matek* did not explicitly or implicitly address the issue of frivolity.   It is therefore of little value to this analysis.

[26] *Templet v. HydroChem Inc.*, 367 F.3d 473, 480 (5th Cir. 2004).

*no evidence* in support of their claims.[27]   Such a circumstance would seem to require some combination of a lack of evidence supporting a claim and contradictory evidence of such a quantum as to render the claim implausible or foreclosed by case law.   *See Cunningham v. Lenape Reg'l High Dist. Bd. of Educ.*, 492 F.Supp.2d 439, 450 (D.N.J. 2007) (deeming retaliation claim frivolous where plaintiff offered no evidence of retaliation, other than his subjective belief, and defendants submitted "voluminous eye witness depositions and written communication" to the contrary).[28]

Applying this standard to this case, the Court concludes that Plaintiffs have introduced sufficient evidence, in the form of the text messages between Boutwell and Dunlap, to take Plaintiffs' claim of state action out of the realm of frivolity.   *See Conte v. Cty. Of Nassau*, No. 06-cv-4746, 2008 WL 905879, at *21 (E.D.N.Y. Mar. 31, 2008) (allegation of "close personal relationship" between state actor and private party sufficient to survive motion to dismiss). Likewise, while the evidence of selective enforcement (a single complaint to Dunlap's supervisors regarding perceived unequal treatment) is so weak as to border on nonexistent, Defendants have offered no evidence that similar establishments were subjected to similar inspections and audits as Rooster's.   As for Plaintiffs' due process claims, the evidence is not so overwhelming as to convince this Court that either: (1) the ABC's actions did not directly dissuade customers from patronizing Plaintiffs' business; or (2) that such actions were neither arbitrary nor taken with an improper motive.   Accordingly, in considering the evidentiary record, the Court concludes that Plaintiffs' claims are neither implausible nor foreclosed by law.

---

[27] *See Miller v. Harrison Cty.*, No. 1:07-cv-541, 2008 WL 4793801, at *2 (S.D. Miss. Oct. 29, 2008) (granting summary judgment on § 1983 claim where there was "no evidence" of state action); *Catlett v. Duncanville Indep. Sch. Dist.*, No. 3:09-cv-1245, 2010 WL 3467325, at *10 (N.D. Tex. Sep. 2, 2010) ("Based on the summary judgment record before the Court, summary judgment is appropriate on Plaintiff's section 1983 claim against Duncanville because, based on Plaintiff's own deposition testimony, there is no evidence of a violation of her constitutional rights.").

[28] The Court is skeptical of whether a subjective issue, such as motivation, may be deemed factually frivolous.

## E. Conclusion

For the reasons discussed above, Defendants' motion to dismiss for lack of jurisdiction must be denied.

## IV
## <u>Sanctions</u>

As stated above, because Plaintiffs have moved for the sanction of a default judgment, the request for such sanction should be addressed next, before Defendants' motion to dismiss or for summary judgment, as the outcome of the sanctions motion will determine if the motion to dismiss or for summary judgment will be reached. Plaintiffs seek the default judgment through their "Motion to Strike Defendants' Answer and for Sanctions Because of Defendant Boutwell's Threat to a Key Witness," alleging that on April 9, 2015, Boutwell attempted to provoke a fight with Mote and when the attempt failed, threatened Mote. Doc. #65 at ¶¶ 3–6. As support for the relief sought, Plaintiffs submitted affidavits from Mote and David Sage, a witness to the encounter, detailing Boutwell's actions towards Mote. Doc. #65-3; Doc. #65-4. In support of their response opposing sanctions, Defendants submitted an affidavit from Boutwell which, in essence, states that his actions on the night in question were caused by stress and alcohol. Doc. #69-2. At the hearing on the motion on June 24, 2015, Mote, Sage, Boutwell, and Boutwell's treating physician all testified. *See* Doc. #81.

### A. Facts Related to Motion for Sanctions

Testimony from the hearing, along with the affidavits submitted in support of and opposition to the motion for sanctions, show that early on the morning of April 9, 2015, Boutwell entered The Corner Bar in Oxford, Mississippi, after the establishment had closed. Doc. #65-4. At the time, Mote, Boutwell's former manager, was sitting to the left of David Sage, the bartender at the bar. *Id.* Boutwell approached Sage's right, patted him on the back,

and asked for alcohol. *Id*. After Sage refused, Boutwell asked again, and Sage refused again. *Id*. Boutwell and Sage proceeded to have "a normal conversation about his restaurants and other stuff." *Id*. During this conversation, Sage, who has run bars for more than fifteen years, "could tell Clint had been drinking, but he did not appear to be drunk. He walked and spoke normally, and never raised his voice." *Id*.

As Boutwell prepared to leave, he turned to Mote and said, "You and your buddy Scott thought you could get me. It'll take more than what you have to get me." *Id*; Doc. #65-3. Boutwell also referenced "having deep pockets" and "plenty of money … to do what he wanted." Doc. #65-3. Mote responded, "I don't want anything to do with it; that's y'all's deal," and then turned away. Doc. #65-3. Mote felt that Boutwell intended to provoke a fight with him. *Id*.

Sage told Boutwell to leave and Boutwell told Mote, "pussies will be pussies." Doc. #65-4. Boutwell then said, "[d]id you hear me Mote? Pussies will be pussies." *Id*. Boutwell then left. *Id*.

Approximately five minutes later, Mote received a text message from Boutwell stating, "And I'll find you when it's over." Doc. #65-3. Following his receipt of the text, Mote believed that Boutwell would try to harm him, "physically or some other way," if he continued to participate in the case as a witness. *Id*. Mote explained at the hearing that part of his fear was driven by the fact that he knew Boutwell carried a gun, although he acknowledged that Michael had said he would only use the gun in self-defense.

Sage observed at the hearing that, upon receiving the text, Mote acted "kind of shocked … he was a little shaken up by it." Approximately forty-five minutes after receiving the text message, Mote spoke with Bob Kelly of the Oxford Police Department, but elected not to pursue charges against Boutwell.

The following afternoon, Boutwell sent Mote a second text stating, "I want to apologize for my comments last night. I had too much to drink and the stress of this entire case and everything surrounding it has taken an emotional and mental toll on me. I had no right to say anything to you and I am sorry." Doc. #69-1. According to Boutwell, he went out drinking that night because, following "a long day at work and a meeting with my attorney regarding this lawsuit, I felt very stressed." Doc. #69-2. Boutwell claims that he drank for approximately three hours before entering the Corner Bar and that, at the time of the incident, he was "intoxicated and was not thinking clearly." *Id*.

Hearing testimony established that, at the time of the incident, Boutwell was on a stimulant called Adipex, although Boutwell testified at the hearing that he could not remember when he took the drug on the day in question. According to Boutwell's treating physician, who testified at the hearing, mixing alcohol with Adipex, which stays in the system for approximately 12–14 hours, causes "[c]entral nervous system over stimulation" and a corresponding loss in inhibition.

Boutwell claimed at hearing that his interaction with Mote was:

just trash talk to a former friend as a result of the alcohol I had consumed. I was not trying to provoke Mr. Mote into hitting me …. I was not trying to threaten Mr. Mote with physical harm as a result of his testimony that he gave at his deposition nor was I trying to threaten him to not testify at the trial of this matter. I have never had any intent to physically harm Mr. Mote whatsoever.

Following the incident, Boutwell was diagnosed with depression and anxiety and has been prescribed medication to deal with these problems. He represented to this Court at the hearing that he has "no intention of carrying out any perceived threat against Mr. Mote."

## B. Sanctions Analysis

Although the title of Plaintiffs' sanction motion states that it seeks to strike Defendants' answer, the body of the motion seeks a default judgment. Doc. #65 at ¶ 6. Because Defendants have not filed an answer in this litigation, the Court is left to interpret the sanctions motion as seeking a default judgment.

"Federal courts have undisputed, inherent power to regulate practice in cases pending before them." *Carroll v. Jacques*, 926 F. Supp. 1282, 1288 (E.D. Tex. 1996) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). "The court is vested with broad discretion to fashion an appropriate inherent power sanction to redress abusive litigation practices." *Carroll*, 926 F. Supp. at 1291 (quoting GREGORY P. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE 440–41 (2d ed. 1994)).

> Inherent power sanctions are essentially punitive, designed to penalize bad faith abuses of the litigation process. While they may be used to compensate the opposing party for fees that should never have been incurred, their compensatory aspect is only incidental. It is within the discretion of the court to determine the appropriate sanction.

> Among the types of inherent power sanctions that the court, in its discretion, may choose to impose are: 1. A fine. 2. An award of reasonable attorneys' fees and expenses. 3. Disqualification of counsel. 4. Preclusion of claims or defenses or evidence. 5. Dismissal of the action. 6. Entry of a default judgment. 7. Suspension of counsel from practice before the court or disbarment. 8. Vacatur of a judgment for fraud. 9. Injunctive relief limiting a person's future access to the courts. 10. A contempt citation. 11. Permitting adverse inference from document destruction.

*Id.* "The inherent power is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *Crowe v. Smith*, 151 F.3d 217, 226 (5th Cir. 1998) (internal quotation marks omitted). When invoked, the moving party bears the burden to justify the exercise of the Court's inherent power to sanction. *In re Actos (Pioglitazone) Prods. Liab. Litig*, No. 6:12-cv-64, 2014 WL 2624943, at *4, 8 (W.D.

La. June 11, 2014); *see also Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 285 (N.D. Cal. 2015) ("It is the moving party's burden to demonstrate that the party against whom it seeks sanctions acted with the requisite bad faith or improper purpose.").

"A decision to invoke the inherent power to sanction requires a finding of bad faith or willful abuse of the judicial process …." *In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014) (internal quotation marks omitted). "[T]he finding of bad faith must be supported by clear and convincing proof." *Id*. at 730. If a particular act justifies the use of the Court's inherent power, "the sanction chosen must employ the least possible power adequate to the end proposed." *Nat. Gas Pipeline Co. of. Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996) (internal quotation marks omitted). Additionally, the court may consider whether the requested dispositive sanction would "deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976).

Here, the record shows that Boutwell engaged in a verbal confrontation with Mote, an identified witness in this case, during which Boutwell referred to his deep pockets and said that he could "do what he wanted." Shortly after that confrontation, Boutwell sent Mote a text message stating that he would "find [him] when it's over."

### 1. Bad Faith Analysis and Issue of Dispositive Relief

As an initial matter, the Court has no trouble concluding that Boutwell's conduct amounts to bad faith or willful abuse of the judicial process. *See Riley v. City of New York*, No. 10-cv-2513, 2015 WL 541346, at *7 (E.D.N.Y. Feb. 10, 2015) ("[C]ourts in this district and others have sanctioned witness tampering pursuant to a court's inherent power.") (collecting cases). Accordingly, the Court must determine whether Boutwell's conduct is sufficiently serious to justify a dispositive sanction. *See Scherer v. Wiles*, No. 2:12-cv-1101, 2015 WL 4512393, at *19

(S.D. Ohio July 24, 2015) ("This Court concludes that although Wiles' [witness tampering] conduct was improper, and thus some sanction is warranted, his conduct fell below the level of egregiousness warranting a default judgment or an extreme monetary sanction."). When considering whether dispositive relief is an appropriate sanction for witness intimidation, other courts have considered: (1) the nature of the threat;[29] (2) whether the threat is likely to have a chilling effect on testimony;[30] (3) whether the threats "are the result not of malice but of mental illness;"[31] and (4) whether the threats are the only instance of improper litigation conduct.[32] Additionally, albeit in other circumstances, courts have observed that evidentiary misconduct is particularly egregious when it relates to a "central issue" in the case. *See Vargas v. Peltz*, 901 F. Supp. 1572, 1581 (S.D. Fla. 1995) (citing *Pope v. Fed. Express Corp.*, 138 F.R.D. 675, 679, 683 (W.D. Mo. 1990)).

Regarding the nature of the threat, the first factor to consider, the Court finds that, while implicitly threatening physical harm initially, Boutwell's interactions with Mote were mitigated after such threat by Boutwell's apology to Mote the following day (before the filing of Plaintiffs' motion for sanctions). *See Logan v. Burge*, No. 09-c-5471, 2010 WL 3940802, at *2 (N.D. Ill. Oct. 6, 2010) (finding threat mitigated by subsequent conduct).

Turning to the potential effect of Boutwell's actions, the Court notes that Mote testified at the evidentiary hearing on the sanctions motion and by affidavit that he felt threatened by

---

[29] *Kalwasinski v. Ryan*, No. 96-cv-6475, 2007 WL 2743434, at *2 (W.D.N.Y. Sep. 17, 2007) ("Death threats directed at an opposing party and a witness are sufficiently serious to warrant the sanction of dismissal."); *Intercounty Nat. Title Ins. Co.*, 2002 WL 1433717, at *12 (noting statements in anonymous letter that "[i]f someone wanted to get you it would be easy" and "[d]id you have a good time at Cavanaughs? I saw you there" "implicitly threatened … physical harm")

[30] *Scherer*; 2015 WL 4512393, at *19 ("Plaintiff has not put forth evidence that Boles' testimony was chilled in any way.")

[31] *Nelson v. Eaves*, 140 F.Supp.2d 319, 322 (S.D.N.Y. 2001).

[32] *Battista v. Dennehy*, No. 05-11456, 2006 WL 1581528, at *8 n.15 (D. Mass. Mar. 22, 2006) (declining to dismiss pro se action based on intimidation of a witness where the intimidation was "the only instance of improper behavior").

Boutwell's conduct. However, there is no indication that Boutwell's conduct had a chilling effect on Mote's future testimony. To the contrary, that Mote testified unfavorably to Boutwell at the sanctions hearing, along with the substance of Mote's testimony against Boutwell at the hearing, strongly suggests that any effect would be minimal. Although Plaintiffs have expressed a fear that Mote may change his testimony at trial or avoid being served by a trial subpoena, Doc. #71 at 6, there is simply no evidence that such a scenario is likely. Thus, the second factor weighs against a dispositive sanction.[33] *Scherer*, 2015 WL 4512393, at *19.

Regarding the cause of the conduct, Boutwell presented credible testimony from his treating physician that he was on a medication that stays in the system for approximately twelve hours and, when combined with alcohol, lowers inhibition and acts as a stimulant. However, there is no indication that the medication was in Boutwell's system at the time of the confrontation. Furthermore, while Boutwell testified that he was drunk and stressed at the time of the confrontation, both Sage (an impartial witness) and Mote testified that Boutwell seemed sober. Under these circumstances, the Court concludes that the third factor weighs against Boutwell.

Fourth, beyond that alleged in the complaint, this is the only instance of misconduct raised in this litigation.[34] Thus, the fourth factor weighs in Boutwell's favor.

Finally, Mote's proposed testimony relates to allegedly inaccurate statements made by Boutwell and thus is tied to a central issue of Plaintiffs' defamation claim. Accordingly, the fifth factor weighs in Plaintiffs' favor.

---

[33] To the extent Mote seeks to change his deposition testimony or avoid a trial subpoena, any damage in this regard may be remedied by deeming the facts in his deposition admitted or using his deposition for impeachment purposes.

[34] Plaintiffs contend that Boutwell previously threatened Mote. Doc. #66 at 5. However, the other threat concerned Mote's comparison of Boutwell's restaurant to another steakhouse, not to Mote's role in this litigation.

The Court recognizes that "witness tampering is an extremely serious offense, and strikes at the heart of the litigation process." *Scherer*, 2015 WL 4512393, at *19. But, in light of Boutwell's apology, the isolated nature of this incident, and Mote's willingness to testify against Boutwell, the Court does not believe that, even allowing for the evidentiary value of Mote's testimony, Boutwell's conduct was so egregious as to justify an ultimate sanction of dismissal or default judgment.

## 2. Effectiveness of Lesser Sanctions

Even if Boutwell's conduct implicated the use of dispositive sanctions, the Court would still conclude that default judgment is inappropriate. The record shows that: (1) there is no indication Boutwell is unable to pay a monetary fine: (2) this is an isolated incident for which Boutwell immediately apologized; (3) the impact on Plaintiffs' case seems minimal, at most; and (4) Boutwell's conduct appears to have been unplanned and instead the product of circumstance and emotion. These factors distinguish this matter from the authority cited in Plaintiffs' motion for sanctions[35] and convince the Court that lesser sanctions will be effective in protecting the Court's function and deterring Boutwell and others from similar conduct. *See Raborn v. Inpatient Mgmt. Partners, Inc.*, 278 Fed. App'x 402, 406–07 (5th Cir. 2008) ("This type of conciliatory response suggests that lesser sanctions would have been effective …."); *see generally* Jones, Owen D., *The Evolution of Irrationality,* 41 Jurimetrics J. 289, 315 (2001) ("It

---

[35] Plaintiffs' motion cites *Johnese v. Jani-King*, No. 3:06-cv-0533, 2008 WL 631237, at * 2–3 (N.D. Tex. Mar. 3, 2008) (dismissing case with prejudice where plaintiff "deliberately defied … clear directive and suborned perjury" and where plaintiff had "limited financial means"); *Young v. Office of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 69–71 (D.D.C. 2003) (dismissing case where plaintiff engaged in repeated discovery violations, attempted to tamper with two witnesses, and was unable "and/or unwilling[] to pay the costs of prosecuting this lawsuit"); *Vargaz*, 901 F. Supp. at 1574, 1579 (dismissing case where plaintiff fabricated false physical evidence and then testified to such evidence in two depositions); and *Pope*, 138 F.R.D. at 679, 683 (dismissing case where plaintiff fabricated physical evidence, lied in her deposition, and made false references in discovery responses).

seems obvious that laws prohibiting [crimes of passion] are likely to be relatively ineffective deterrents.").

Accordingly, dispositive sanctions are unwarranted in this action.  Rather, the Court will direct Defendants to pay Plaintiffs' reasonable attorney's fees and expenses incurred in association with the motion for sanctions.  *See Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 80 (3d Cir. 1994) (The district court "could have imposed monetary sanctions to signal its disapproval of the Republic's conduct and its intolerance of any future harassment or intimidation.").  Additionally, the Court imposes a $1,000 fine, to be paid to the Court.[36]

V

## Motion to Dismiss, or in the Alternative, for Summary Judgment

Defendants have sought dismissal pursuant to Rule 12(b)(6), or in the alternative, summary judgment.  In support of this motion, Defendants submitted numerous exhibits and Plaintiffs responded with exhibits of their own.

As a general matter, where defendants have filed a 12(b)(6) motion and "submitted matters outside the pleadings without such evidence being excluded by the Court [within ten days]," the proper course is to treat the 12(b)(6) motion as a motion for summary judgment. *McNair v. Mississippi,* 43 F.Supp.3d 679, 682 (N.D. Miss. 2014) (citing *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1284 (5th Cir. 1990)).

Here, more than ten days have passed since Defendants submitted matters outside the pleadings without such evidence being excluded by this Court.  Under these circumstances, the Court will treat Defendants' 12(b)(6) motion as a motion for summary judgment.  *McNair*, 43 F.Supp.3d at 682 ("Here, more than ten days have passed since Defendants submitted matters

---

[36] While punitive fines may be subject to additional procedural requirements, this rule does not apply to "petty" amounts.  *See Crowe*, 151 F.3d at 228; *see also Miller v. City of Los Angeles*, 661 F.3d 1024, 1030 (9th Cir. 2011) (inherent power allows court to impose "non-compensatory" sanctions to deter future misconduct so long as such sanctions are not of a "magnitude … akin to criminal contempt") (collecting cases, including *Crowe*).

outside the pleadings without such evidence being excluded by the Court. Under these circumstances, Defendants' motion should be treated as one for summary judgment.").

## A. Summary Judgment Standard

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship,* 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 22–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Norwegian Bulk Transp. A/S,* 520 F.3d at 411–12 (internal quotation marks omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id.* at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.,* 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted). When considering a motion for summary judgment, the Court

"resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

## B. Analysis

Defendants seek summary judgment on all of Plaintiffs' claims, including the § 1983 claims. Doc. #60 at 18–23. Regarding the § 1983 claims, Defendants argue that Plaintiffs have not established the requisite state action to support such claims. *Id.* As set forth above, Plaintiffs may establish state action by showing an agreement between Boutwell and the ABC to commit an illegal act and a deprivation of constitutional rights; or that the ABC took the allegedly illegal actions without independent investigation and because Boutwell directed the actions. *Priester*, 354 F.3d at 420; *Sims*, 778 F.2d 1078–79.

Plaintiffs respond that they have established state action based on: (1) Boutwell's text that Michael was having a private party; (2) Boutwell's inquiry, and Dunlap's response, regarding inspections of Rooster's; (3) Boutwell's factually incorrect text regarding Rooster's food sales; (4) Boutwell's text to Dunlap implying that the loss of the computer system was intentional; (5) Boutwell's March 5, 2014, texts to Dunlap regarding Rooster's obtaining its food from Petra's, including Boutwell's text "let's get this over with! I have much to do!!" and Dunlap's response "I hear ya;" (6) Boutwell's acceptance of a reservation for Dunlap's supervisor; and (7) the February 2015 sweep. Doc. #63 at 9–12.

Taken together, the evidence cited by Plaintiffs establishes that Boutwell and Dunlap texted regularly; that Boutwell expressed a desire for Rooster's to close, and that Dunlap acknowledged the sentiment on one occasion; that Boutwell occasionally texted Dunlap inaccurate information regarding Rooster's; that Dunlap requested a reservation for his supervisor without knowledge that Boutwell did not accept reservations; that ABC agents

conducted a sweep in Oxford which resulted in numerous agents congregating at Rooster's; and that Dunlap improperly disclosed to Boutwell information about the ABC's relationship with Rooster's. These facts simply cannot create a genuine issue of material fact that Boutwell (or his business) was a state actor with regard to any ABC activity taken against Rooster's.

First, the undisputed evidence establishes that Dunlap regularly communicated with other business owners in Oxford regarding potential violations. Accordingly, his communications with Boutwell do not establish a conspiracy or other form of state action. *See Murphy v. Plain Dealer Pub. Co*., No. C86-2217, 1991 WL 337361, at *4 (N.D Ohio May 8, 1991) ("Lt. Leppert is the media liaison officer for the City of Berea Police Department. Ms. Woge is a reporter for *The Plain Dealer.* These people were simply doing their respective jobs, and Plaintiff's conclusory allegations neither establish a conspiracy nor even suggest a conspiratorial motive"); *see also Morris v. New York City*, No. 14-cv-1749, 2014 WL 3897585, at *2 (E.D.N.Y. Aug. 8, 2014) ("[I]t is a normal part of police work for officers to speak with and question complaining witnesses ….").

Second, while there can be no doubt that Boutwell wanted Rooster's closed and that Dunlap knew of this desire, "a private party's motivation is irrelevant to the determination of whether that private party acted under color of state law." *Young v. Suffolk Cty.*, 922 F.Supp.2d 368, 386 (E.D.N.Y. 2013) (collecting cases). Thus, absent evidence that Dunlap (or anyone at ABC) took any action against Rooster's or Michael *because* Boutwell wanted such action taken, Boutwell's subjective motivation has no impact on the state actor inquiry. *See Manax v. McNamara*, 842 F.2d 808, 813 (5th Cir. 1988) ("Providing information to the state *and pressing for state action against an individual*, without more, cannot suffice to make a private entity liable under section 1983 as a state actor.") (emphasis added). Similarly, in the absence of evidence

that Dunlap knowingly acted on false information, Boutwell's provision of such information does not establish state action. *See Donley v. Hudson's Salvage, LLC*, No. 10-3223, 2011 WL 5930473, at *20 (E.D. La. Nov. 29, 2011) ("[P]rivate citizens who give information to law enforcement do not become state actors under Section 1983 when the information is used to effect an arrest, even if the citizen knew that the information was false.") (collecting cases) (internal emphases omitted).

Next, while the Court assumes that the request for a favor by a state actor and provision of a favor by a private actor may suggest an improperly close relationship between the two,[37] there is simply no evidence that Dunlap (or his supervisor) believed they were asking for a favor from Boutwell when Dunlap submitted the request for the reservation. To the contrary, Dunlap's uncontradicted deposition testimony demonstrates that, at the time he asked for the reservation, he was unaware of Boutwell's policy of not accepting reservations. Under these circumstances, the Court declines to impute any improper relationship between Boutwell and Dunlap or Dunlap's supervisor.

As for the February 2015 sweep, the evidence is undisputed that the reason for the large number of ABC agents at Rooster's was that the two groups of agents happened to reach the bar at the same time. Additionally, and more importantly, there is absolutely no evidence that the sweep (or the congregation at Rooster's) was at all tied to Boutwell or his business.

Finally, while Dunlap testified that specific enforcement issues should not be discussed with third parties, Plaintiffs have introduced no evidence that this prohibition is anything more than a best practice. Furthermore, even if such disclosure could be considered improper,

---

[37] *See generally Wagenmann v. Adams*, 829 F.2d 196, 210 (1st Cir. 1987) ("That a private citizen felt free to contact the deputy chief of the city's police department at an unpublished telephone number, while the latter was off duty, lends a certain credence to Stephen's warning—voiced to the plaintiff in late 1985—that Anderson was a powerful figure in Worcester and could have Wagenmann arrested at will.").

Plaintiffs have failed to show how or why the provision of such information shows that Dunlap (or the ABC) took any action against Plaintiffs because of a conspiracy with Boutwell or because Boutwell directed such action. Thus, while this disclosure is concerning, it does not create a genuine issue of material fact as to Boutwell's alleged improper influence or the existence of an alleged conspiracy. *See generally Ellis v. Safranek*, No. 8:07-cv-118, 2008 WL 413863, at *3 (D. Neb. Feb. 13, 2008) ("Plaintiff alleges that Defendants received information 'taken from [Plaintiff's] bedroom by O.P.D.' However, there are no allegations that Defendants acted in concert with the Omaha Police Department or that Defendants and the Omaha Police Department had a 'meeting of the minds' to deprive Plaintiff of a constitutional right.") (internal citations omitted). In reaching this conclusion, the Court distinguishes this matter from *Wagenmann*, in which the First Circuit found that certain evidence "barely" supported a jury determination of state action following an arrest, specifically, that a third party had warned the plaintiff that the private individual could have him arrested against his will; there was little to no evidence supporting the private actor's complaints to police; the arresting officer "described the investigation in such a way as to permit a finding that the decision to arrest … was a collective one … rather than solely an official;" and the private party contacted the deputy chief of the city's police department "at [an] odd hour at home." 829 F.2d at 209–11.

Here, unlike in *Wagenmann*, there is no dispute that the actions taken by the ABC and Dunlap were supported by probable cause; the arresting officer (Dunlap) explicitly denied any conspiracy with, or direction from, Boutwell; no third party testified as to Boutwell's influence over the ABC; Roosters' and Michael had been the subject of similar ABC investigations well before Boutwell became involved with Michael; Dunlap proffered a legitimate reason for the use of his personal cellular phone; and the ABC renewed Rooster's license despite the establishment

failing to meet its food sales requirements.  *See Basu v. Brogan*, 47 Fed. App'x 586, 588 (1st Cir. 2002) ("Here, unlike *Wagenmann*, the arrest was supported by probable cause, there was no evidence of overweening influence on the officers, and there was no evidence of conspiracy. That dooms the claim.").

Under these circumstances, the Court concludes that, even drawing every reasonable inference in favor of Plaintiffs, there is no genuine issue of material fact as to whether either Defendant may be considered a state actor under either a conspiracy or joint action theory.  The evidence is uncontradicted that Dunlap conducted independent investigations into Boutwell's complaints about Rooster's, including during the period before Plaintiffs and Defendants executed the sublease.  Also, notwithstanding the possibly improper disclosure, there is simply no evidence that Dunlap (or any ABC official) agreed with Boutwell to close down Rooster's, as alleged in the second amended complaint.  To the contrary, the evidence shows that Dunlap and the ABC took efforts *not to* shut Rooster's down by just issuing a warning regarding the importing of food from Petra and by renewing Rooster's license despite it not meeting its food sales goals.  Therefore, summary judgment must be granted in favor of Defendants on Plaintiffs' § 1983 claims.  *Williams v. Dillard's Dep't Stores, Inc.*, 211 Fed. App'x 327, 330 (5th Cir. 2006) ("The district court properly granted summary judgment on Williams's § 1983 claim against Dillard's; because Officer Riley conducted an independent investigation, Dillard's was not a state actor, a requirement of § 1983 claims.").

## VI
## Supplemental Jurisdiction

Having determined that Plaintiffs' § 1983 claims must be dismissed, which claims comprise all of Plaintiffs' federal claims, this Court is divested of federal question jurisdiction. In such a situation, "the court must exercise its discretion whether to exercise supplemental

jurisdiction" pursuant to 28 U.S.C. § 1367(c)(3). *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999). 28 U.S.C. § 1367(c)(3) provides:

> The district courts may decline to exercise supplemental jurisdiction [if] (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Courts in the Fifth Circuit treat these four categories as "statutory factors" to consider when evaluating supplemental jurisdiction. *Enochs v. Lampasas Cty.*, 641 F.3d 155, 159 (5th Cir. 2011). Additionally, the Fifth Circuit requires consideration of "common law factors [of] judicial economy, convenience, fairness, and comity." *Id.* (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

When a district court dismisses all federal claims before trial, "the general rule is to dismiss any pendent claims." *Bass*, 180 F.3d at 246. However, the Fifth Circuit "has consistently held that declining supplemental jurisdiction following a significant investment of judicial resources in the litigation constitutes an abuse of discretion." *Seals v. Mississippi*, 998 F.Supp.2d 509, 527 (N.D. Miss. 2014) (citing *Brookshire Bros. Holding, Inc. v. Dayco Prod. Inc.*, 554 F.3d 595, 602 (5th Cir. 2009)).

Here, while Plaintiffs' second amended complaint does not involve complex issues of state law, the remaining factors support dismissal. The second statutory law factor weighs in favor of dismissal because the state law claims predominate over the non-existent federal law claims. The third statutory factor weighs in favor of dismissal because the federal claims will be dismissed by this order. Finally, as explained below, the fourth factor, which incorporates the common law factors, weighs in favor of dismissal. *See Enochs*, 641 F.3d at 159 ("The fourth

[statutory] factor also favors remand, as the heavy balance of the common law factors in favor of remand constitutes another compelling reason to decline jurisdiction.").

Turning to the common law factors, the judicial economy factor weighs in favor of dismissal because "at the time the federal claims were deleted hardly any federal judicial resources, let alone a significant amount of resources, had been devoted to the ... consideration of the ... state law claims (or to any claims)."[38] *Id.* Next, neither party has offered any argument as to convenience. Accordingly, the Court deems this factor neutral. The third common law factor also weighs in favor of dismissal because "it [is] certainly fair to have … the purely … state law claims heard in … state court …." *Id.* Finally, insofar as federal courts are "not as well equipped for determinations of state law as are state courts," the fourth common law factor of comity is served by dismissal. *Id.*; *see also Diaz v. Estate of Lampton*, No. 3:09–cv–324, 2013 WL 3213087, at *16 (S.D. Miss. June 26, 2013) (dismissing state law claims "without prejudice so that a state court of competent jurisdiction may resolve them").

Upon consideration of the statutory and common law factors, the Court will follow the Fifth Circuit's general rule and decline to exercise supplemental jurisdiction over the state law claims. Accordingly, Plaintiffs' state law claims will be dismissed without prejudice.

## VIII
## Conclusion

For the reasons set forth above:

1.      Defendants' motion to dismiss for lack of subject matter jurisdiction [72] is **DENIED.**

---

[38] Apart from this order and the February order directing the filing of a second amended complaint (which in itself involved little judicial resources), the only judicial orders in this case have been procedural. *See* Doc. #7; Doc. #10; Doc. #21; Doc. #26; Doc. #32; Doc. #39; Doc. #52; Doc. #54; Doc. #75.

2.      Plaintiffs' motion for sanctions [65] is **GRANTED in Part and DENIED in Part**.  It is DENIED to the extent it seeks default judgment and is GRANTED to the extent it seeks monetary sanctions.  Defendants shall pay Plaintiffs their reasonable attorney's fees and expenses associated with the motion for sanctions.  Defendants shall also pay the Court $1,000 as a fine for Boutwell's conduct, to be paid to the Clerk of Court, 911 Jackson Ave East, Suite 369, Oxford, Mississippi 38655.

3.      Defendants' motion to dismiss or in the alternative for summary judgment [59] is **GRANTED in Part and DENIED in Part**.  It is GRANTED to the extent it seeks summary judgment as to Plaintiffs' § 1983 claims and is DENIED without prejudice as to all other remaining claims.  The Court declines to exercise supplemental jurisdiction over the remaining claims.

**SO ORDERED**, this 7th day of October, 2015.

/s/ **Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**